***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission. All parties have been correctly designated and there is no question as to misjoinder or non-joinder of parties. *Page 2 
2. Plaintiff and defendant are subject to and bound by the provisions of the Workers' Compensation Act.
3. Defendant regularly employed three or more employees on June 28, 2007.
4. The employer-employee relationship existed between plaintiff and defendant on June 28, 2007.
5. Defendant is a qualified self-insurer and PMA is currently the third-party administrator.
6. On the morning of June 28, 2007, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant when he was stung by yellow jackets while weed-eating around a manhole.
7. Defendant admitted liability for the yellow jacket sting injury as a "medical only" claim on a Form 60 dated July 26, 2007.
8. Plaintiff's average weekly wage is $555.65 and his compensation rate is $370.44.
9. Following the June 28, 2007 motor vehicle accident, plaintiff was out of work from June 29, 2007 through August 20, 2007. During that time, he was paid for 8 days (64 hours) of sick leave, and 6.5 days (52 hours) of vacation leave.
 ***********
The following were submitted into evidence as:
 EXHIBITS
1. Stipulated Exhibit Number 1: Pre-Trial Agreement, Medical Records, Industrial Commission Forms;
2. Defendant's Exhibit Number 1: Defendant-Employer Employee Health Medical Record for Plaintiff; *Page 3 
3. Defendant's Exhibit Number 2: Highway Patrol Accident Report;
4. Defendant's Exhibit Number 3: Form 19, Defendant-Employer's Supervisor's Accident Investigative Report, Form 18 and OSHA's Form 301 Injuries and Illnesses Incident Report.
 ***********
The following were received into evidence as:
 DEPOSITIONS
1. Oral deposition of Jonathan Chappell, M.D., taken on January 28, 2009.
2. Oral deposition of Vincent L. Firrincieli, M.D., taken on January 29, 2009 with Plaintiff's Exhibit numbers 1 and 2 and Defendant's Exhibit numbers 1 and 2 attached to the deposition transcript.
3. Oral deposition of Robert M. Ross, M.D., taken on February 4, 2009 with Plaintiff's Exhibit number 1 and Defendant's Exhibit number 1 attached to the deposition transcript.
 ***********
The following were submitted by the parties as:
 ISSUES
1. Whether the injuries plaintiff sustained in the motor vehicle accident while driving home from work on June 28, 2007 are compensable under the North Carolina Workers' Compensation Act?
2. If so, to what compensation is plaintiff entitled to receive?
 ***********
Based upon all the competent evidence of record, the Full Commission makes the *Page 4 
following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 31-year-old high school graduate. Following high school, he attended North Carolina State University and Wingate College.
2. On June 28, 2007, plaintiff was employed by defendant-employer as a locator and equipment operator. His duties required him to assist in maintaining sewer easements. On June 28, 2007, plaintiff was stung multiple times by yellow jackets while he was weed-eating around a manhole. Plaintiff testified that as he was weed-eating next to a manhole he felt something bite him, and when he looked down, yellow jackets were covering his legs and they were everywhere. He started running toward the truck and beating the yellow jackets to get them off of him. Plaintiff's co-worker, Eric Bolin, helped him beat the yellow jackets off of him. Mr. Bolin testified that the yellow jackets attacked plaintiff. As a result of the yellow jacket stings plaintiff testified that he had red marks "all over my legs and arms and face and back, everywhere." Plaintiff's testimony that he was stung at least 30 times is found to be credible.
3. Defendant accepted the compensability of plaintiff's claim as "medical only" by filing a Form 60.
4. Following the yellow jacket stings, plaintiff began to feel "lightheaded and dizzy, kind of out of it." Mr. Bolen drove plaintiff to the shop to report his injury. Plaintiff was directed to seek treatment with defendant-employer's Occupational Health Nurse, Sandra Perry.
5. Plaintiff saw Nurse Perry at 10:35 a.m. He reported that he was lightheaded and dizzy and kind of "out of it." The June 28, 2007 medical note of Ms. Perry indicated that plaintiff complained of multiple bites by yellow jackets. Ms. Perry noted that there were three *Page 5 
bite marks on the right forearm, three on the left forearm, "multiple bites on legs, stomach and on bottom." Ms. Perry testified that she did not know how many yellow jacket stings plaintiff actually had; she only counted the ones on his forearms that she saw. Plaintiff reported that the redness and swelling from the stings were decreasing. Plaintiff was given hydrocortisone cream to use and advised to take Benadryl or Claritin for itching. Ms. Perry's medical note did not document whether plaintiff was given Benadryl to take with him, but she testified that he declined to take it at the time of his visit because he wanted to work and was concerned about the Benadryl making him drowsy. Ms. Perry testified that plaintiff's blood pressure was borderline high, but his pulse and respirations were normal. Ms. Perry's medical note documented that plaintiff was advised to go home after lunch "if lightheadedness persists."
6. Plaintiff rode back to the shop with Mr. Bolin. Upon returning to the shop, plaintiff spoke to Mr. Medlin, the shop superintendent. Mr. Medlin inquired about plaintiff's examination by the Occupational Nurse. Mr. Medlin instructed plaintiff and Mr. Bolin to go to lunch and then resume their morning work. Plaintiff rode to lunch, but could not remember whether he ate anything. He testified that they would have brought lunch back to the shop to be eaten.
7. Plaintiff informed Mr. Bolin that he did not think he was feeling well enough to go back into the field to work. Plaintiff and Mr. Bolin worked together as a team. Plaintiff did not work with Mr. Bolin after lunch. He remained at the shop. Plaintiff's testimony that he remained at the shop and did not work after lunch on June 28, 2007 is found to be credible. Mr. Bolin next saw plaintiff at the end of the workday at approximately 2:30 p.m. When Mr. Bolin returned to the shop he saw plaintiff coming out of the door. He asked plaintiff how he was *Page 6 
feeling. Plaintiff told Mr. Bolin he was feeling better, but he was not 100 percent and that he was going to go home and go to bed.
8. Mr. Medlin worked in the shop during the afternoon of plaintiff's injury. He testified that after instructing plaintiff and Mr. Bolin to go to lunch and return to work, he did not see plaintiff again until approximately 2:15 p.m. when plaintiff came in the front door appearing hot and sweaty. Mr. Medlin works in a cubicle to the left of the large open area of the shop. Mr. Medlin does not recall if he got up and walked around during the afternoon when plaintiff testified he was at the shop. He could only testify that he did not recall seeing plaintiff at the shop after lunch.
9. At approximately 2:15 p.m., plaintiff met Parrish Leonard, Utilities Supervisor, to complete the workers' compensation paperwork for the yellow jacket stings. Mr. Leonard works primarily in the office, but he also works outside the office. He does not recall seeing plaintiff in the office on the afternoon of June 28, 2007. Plaintiff appeared fine to him during the approximately ten minutes when they were completing paperwork.
10. As plaintiff was leaving the shop at the end of the work shift at 2:30 p.m., Mr. Medlin asked plaintiff how he was feeling and plaintiff reported that everything was fine.
11. While driving home following his June 28, 2007 shift, plaintiff was involved in a motor vehicle accident. Plaintiff's vehicle ran off the road and collided with a tree. The accident investigator found no evidence that plaintiff took any evasive action. As a result of the motor vehicle accident, plaintiff sustained an open dislocation fracture of the right ankle.
12. Plaintiff does not remember leaving the shop on June 28, 2007. His last memory of events before waking up in the hospital was completing the accident paperwork with Mr. *Page 7 
Leonard. He has no idea how the accident occurred. The State Highway Patrol Officer who investigated the accident was unable to determine the cause of the accident.
13. Following the motor vehicle accident, plaintiff had surgery on his right ankle and remained out of work from June 28, 2007 to August 21, 2007. Plaintiff returned to work and continues to work for defendant-employer earning the same or greater wages than he was earning at the time of his injury. Plaintiff has a permanent work restriction that he should be allowed to sit as needed.
14. Plaintiff will likely require cortisone injections to his right shoulder indefinitely and there is a substantial likelihood that he will need further treatment that may include an arthrodesis or ankle fusion. Based upon the evidence of record, the Full Commission is unable to determine whether plaintiff's shoulder complaints are related to his vehicular accident. Plaintiff's treating physician recommends an MR/arthrogram for further evaluation of the right shoulder problem. The Full Commission is leaving this issue open for subsequent determination.
15. On August 13, 2008, plaintiff presented to Dr. Vincent Firrincieli, a specialist in allergy and immunology. Dr. Firrincieli was of the opinion that plaintiff was stung at least 30 times by yellow jackets on June 28, 2007 and passed out while driving home from work when he was involved in a motor vehicle accident. Dr. Firrincieli opined that the multiple yellow jacket stings resulted in plaintiff's dizziness and a likely decrease in his mental status, possibly loss of consciousness, and resulted in the motor vehicle accident. Dr. Firrincieli was of the opinion that plaintiff developed a toxic reaction to the yellow jacket stings which caused him to lose his mental status and run off the road and hit the tree. Dr. Firrincieli did not find plaintiff to be allergic to the venom of yellow jackets. Dr. Firrincieli also opined that being stung 30 times placed plaintiff at an increased risk of passing out or experiencing decreased mental status. He *Page 8 
also felt that plaintiff's medication (atenenol) could have contributed to a decrease in blood pressure.
16. Dr. Firrincieli's opinion that plaintiff developed a toxic reaction to yellow jacket stings was based upon his assumption that plaintiff was stung at least 30 times. He was less certain of his opinion when asked to assume plaintiff was stung 15 times. During cross examination, defendant also questioned Dr. Firrincieli concerning his opinion that plaintiff experienced low blood pressure which contributed to his passing out and provided him with blood pressure readings indicating that plaintiff's blood pressure was borderline high after the stings and also after his accident. After seeing the two blood pressure readings Dr. Firrincieli was less certain of his opinion that plaintiff had a drop in blood pressure.
17. Defendant also challenged Dr. Firrincieli's opinion that plaintiff had a toxic reaction to the yellow jacket stings, suggesting that plaintiff did not have a sufficient number of stings to develop a toxic reaction, that he did not exhibit the classic symptoms and that his opinions were not supported by medical literature. With respect to whether a person might pass out without a drop in blood pressure, Dr. Firrincieli testified that some people can have a vasovagal syncope episode and may pass out without a blood pressure drop. Based upon the greater weight of the evidence, the Full Commission finds as fact that the blood pressure reading plaintiff had after the accident does not establish what his reading was at the time of the accident and that the trauma from his injuries could have caused a rise in plaintiff's blood pressure. At the parties' request, after his deposition Dr. Firrincieli provided medical literature which tended to support his opinions. *Page 9 
18. Defendants retained Dr. Robert M. Ross, an expert in the field of allergy and immunology, to perform a medical records review in this claim for the purpose of providing expert opinion testimony. Dr. Ross also reviewed the deposition testimony of Dr. Firrincieli.
19. Dr. Ross was of the opinion that a toxic reaction may mimic an allergic reaction in some respects, but with a toxic reaction a person is not likely to feel a severe response immediately. The condition is likely to progress over a period of an hour or two and gradually gets worse. He opined that some people may have delayed toxic responses to fifteen to eighteen stings and may appear perfectly normal after three or four hours, but develop severe symptoms later. Dr. Ross has never treated or researched toxic responses to bee stings. He reviewed some articles for the purpose of offering opinions in this case. Dr. Ross found three articles that indicated it took 50 or more honeybee stings to develop a systemic toxic response. Based upon his reading of the literature, he opined that, more likely than not, plaintiff did not pass out due to a toxic reaction, causing his motor vehicle accident. The main reason Dr. Ross does not attribute the automobile accident to plaintiff's yellow jacket stings is due to the number of times plaintiff was stung. He felt that a systemic response to 15-30 bee stings would be rare, but admitted it is possible to have a toxic reaction with below 50 stings. He agreed that lightheadedness can be a toxic systemic reaction. His opinions appeared to be based on articles dealing with honeybees.
20. When plaintiff presented Dr. Ross with a medical article from the Quarterly Journal of Medicine stating that fewer yellow jacket (vespid) stings are needed to produce life-threatening envenomation over the stings of honeybees, Dr. Ross did not disagree with the statement because he was unaware of this finding. The article indicated that 30 yellow jacket stings would be the equivalent of 200 honeybee stings. Dr. Ross did not disagree with the statement in one of the medical articles that, "Pediatric deaths will occur with as few as a *Page 10 
hundred and fifty bee stings and thirty wasp stings." One of the medical studies provided by Dr. Firrincieli suggested that there should be careful observation of patients with more than 10 wasp stings. However, Dr. Ross would not agree that a person might pass out due to a toxic response with as few as 10 wasp stings. He was of the opinion that if plaintiff passed out from the yellow jacket stings, it had to be a vasovagal response, rather than a toxic reaction. He was of the opinion that plaintiff probably did pass out. When asked if he had to give an opinion about what the most likely cause of plaintiff passing out was, what would that opinion be, Dr. Ross responded:
 You know, the most likely reason why he passed out, you know I really-I really don't know. I-I would say that the most likely thing is that because of all of these reactions, these things, and all of this kind of stuff that he had, he could have become, you know, upset and fearful and started to worry about this whole event, and he had-more likely that he had a vasovagal reaction in which he suddenly dropped his blood pressure and lost consciousness and ran off the road.
Dr. Ross also opined that the yellow jacket stings placed plaintiff at an increased risk of passing out compared to the general population.
21. The Full Commission finds as fact that plaintiff sustained an injury by accident arising out of and in the course of his employment when he was stung by at least 30 yellow jackets while weed-eating around a manhole.
22. After careful review of all the evidence presented, the Full Commission gives greater weight to the opinion testimony of Dr. Firrincieli and finds as fact that plaintiff was stung at least 30 times by yellow jackets on June 28, 2007 and as a result, developed a toxic reaction to the yellow jacket stings which caused him to lose his mental status, pass out and run off the road and hit a tree. *Page 11 
23. Plaintiff's automobile accident, which occurred while he was on his way home from work approximately five hours after being stung, flowed directly from and was causally related to the 30 or more yellow jacket stings that he sustained at work. The opinion of Dr. Ross that plaintiff's passing out which led to the motor vehicle accident was more likely caused by a vasovagal response to all the events of the day, including the yellow jacket stings, would also satisfy plaintiff's burden of showing a causal relationship between the yellow jacket stings and the subsequent motor vehicle accident.
24. The medical treatment plaintiff received following the motor vehicle accident, including surgery on his right ankle, was reasonably related to his compensable injury. Plaintiff will likely need future medical treatment as a result of his compensable injury.
25. As a result of his motor vehicle accident plaintiff was disabled from work from June 28, 2007 through August 20, 2007.
26. Plaintiff's average weekly wage is $555.65 and his compensation rate is $370.44.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On June 28, 2007, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer when he was stung multiple times by yellow jackets while he was weed-eating around a manhole. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff bears the burden of establishing compensability of his claim for benefits resulting from his motor vehicle accident while traveling home following his shift for the day. It is plaintiff's burden to prove that the motor vehicle accident flowed directly from and was a direct and natural consequence of his injury by accident due to yellow jacket stings. Roper v. *Page 12 J.P. Stevens Co., 65 N.C. App. 69, 73-74, 308 S.E.2d 485, 488
(1983); Holley v. ACTS, Inc., 357 N.C. 228, 231;581 S.E.2d 750, 752 (2003).
3. The competent evidence of record establishes that plaintiff sustained his motor vehicle accident as a direct and natural consequence of his compensable June 28, 2007 injury by accident due to yellow jacket stings. N.C. Gen. Stat. § 97-2(6); Roper v. J.P.Stevens Co., 65 N.C. App. 69, 73-74; 308 S.E.2d 485, 488
(1983).
4. Plaintiff failed to prove that his shoulder condition is causally related to his compensable injury. Holley v. ACTS,Inc., 357 N.C. 228, 231; 581 S.E.2d 750, 752 (2003).
5. The medical treatment plaintiff received following the motor vehicle accident, including surgery on his right ankle, was reasonably related to his compensable injury and was reasonably designed to effect a cure, provide relief or lessen his disability. There is a substantial likelihood that plaintiff will need future medical treatment as a result of his compensable injury. Defendant is obligated to pay for such treatment. N.C. Gen. Stat. §§ 97-25,97-25.1.
6. As a result of his motor vehicle accident plaintiff was disabled from work from June 28, 2007 through August 20, 2007 and is entitled to temporary total disability compensation during this period. N.C. Gen. Stat. § 97-29; Russell v. Lowes ProductDistribution 108 N.C. App. 762; 425 S.E.2d 454 (1993).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendant shall pay temporary total disability compensation to plaintiff at the rate of $370.44 per week from June 29, *Page 13 
2007 through August 20, 2007. Any accrued compensation shall be paid in a lump sum subject to attorney fees and offsets for wage continuation.
2. Defendants shall pay all medical expenses incurred or to be incurred in the future as a result of plaintiff's June 28, 2007 work injury, for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen his period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. A reasonable attorney's fee of 25 percent is hereby approved for plaintiff's counsel from the sums due plaintiff under paragraph one, above. Defendants shall deduct and pay directly to plaintiff's counsel 25 percent of the accrued compensation owed to plaintiff before deductions for any wage continuation.
4. Defendant shall pay the costs of these proceedings.
This the ___ day of December 2009.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ STACI T. MEYER COMMISSIONER
 S/_____________ DANNY LEE McDONALD COMMISSIONER *Page 1